# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>PHYLOS, INC.,<br><br>                  Debtor. | Chapter 11<br><br>Case No. 03-11303 (MFW) |
| LEDGEMONT REALTY TRUST<br><br>             Plaintiff,<br><br>     v.<br><br>PHYLOS, INC. and<br>GUSTAV CHRISTENSEN,<br><br>          Defendants. | Adversary No. 04- |

## COMPLAINT FOR (A) REVOCATION OF CONFIRMATION ORDER PURSUANT TO 11 U.S.C. § 1144; (B) APPOINTMENT OF A CHAPTER 11 TRUSTEE; (C) BREACH OF FIDUCIARY DUTY; AND (D) FOR OTHER RELATED RELIEF

Ledgemont Realty Trust ("Ledgemont" or "Plaintiff") hereby files this Complaint against Phylos, Inc. ("Debtor" or "Defendant") for (A) Revocation of the Confirmation Order Pursuant to 11 U.S.C. § 1144; (B) Appointment of a Chapter 11 Trustee; (C) Breach of Fiduciary Duty; and (D) For Other Related Relief (the "Complaint"), and in support thereof, respectfully states as follows.

### INTRODUCTION

1.	This is an action against the Debtor seeking, *inter alia*, revocation of the Confirmation Order (as herein defined) based on the Debtor's misrepresentations and fraud in connection with (i) the approval of the Debtor's Disclosure Statement and confirmation of the Plan (as such terms are hereafter defined); (ii) the Debtor's assets and liabilities; (iii) statements to the Court that the Debtor has complied with the Section 1129(a) of the Bankruptcy Code,

including, without limitation, that the Debtor acted in good faith (Section 1129(a)(3)) and that the Plan (as herein defined) was feasible (Section 1129(a)(11)); (iv) the purpose of the Plan; and (v) the treatment of Ledgemont's claims against the Debtor. This Complaint also seeks (i) the appointment of a chapter 11 trustee and (ii) standing to pursue, and damages in connection with, derivative claims of breach of fiduciary duty by the Debtor and Gustav Christensen.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the parties and the claims set forth in this Complaint pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(L) and (O).

3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES AND PARTIES IN INTEREST

4.     The Debtor was a privately held Delaware Corporation which operated biopharmaceutical business that was formed in 1997 by Dr. Brian Seed and Dr. Jack Szostak. The Debtor's principal place of business is located at 128 Spring Street, Lexington, Massachusetts.

5.     Gustav Christensen is an individual who resides at 3 Idylwilde Road, Lexington, Massachusetts, 02421. At all times relevant to this Complaint, Gustav Christensen was a director and officer of the Debtor, and pursuant to the Plan, is the Debtor's current sole director and officer.

6.     Ledgemont is a trust established on December 12, 1984, with its principal place of business located at 177 Milk Street, Boston, MA 02109.

## FACTUAL BACKGROUND

7.     The Plaintiff incorporates each of the allegations set forth in the preceding

paragraphs as if fully set forth herein.

## The Prepetition Lease

8.     On September 17, 1998, the Debtor leased its offices and research facilities located at 128 Spring Street, Lexington, Massachusetts from Ledgemont pursuant to that certain lease (as amended, the "Lease").

9.     The Lease was amended four times prior to the Debtor's bankruptcy and provided for the payment of an annual fixed rent based on the square footage leased by the Debtor in addition to other expenses, including without limitation, real estate taxes and operating expenses.

## The Debtor's Bankruptcy and Assumption of the Lease, as Amended

10.     On April 30, 2003 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of title 11 the United States Code, 11 U.S.C. §§101-1330 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

11.     The Debtor operated its business as a debtor-in-possession pursuant to Bankruptcy Code Sections 1107 and 1108.

12.     No official committee of unsecured creditors was appointed in this bankruptcy case.

13.     Prior to and during the bankruptcy case, the Debtor struggled to keep current on its obligations under of the Lease. At the Debtor's request, Ledgemont and the Debtor negotiated a post-petition amendment to the Lease which provided for (a) a reduction of the rent payable under the Lease, (b) a reduction in the size of the premises leased by the Debtor and (c) a portion of rent to be deferred. The amendment to the Lease and the modifications thereunder were designed to assist the Debtor in its reorganization efforts.

14.     These negotiations culminated in the Debtor's Motion for Authority to (A) Execute Lease Amendment and (B) Assume Unexpired Lease With Ledgemont Realty Trust (As Amended) [D.I. 47] (the "Lease Assumption Motion"), filed on June 27, 2003. Pursuant to the Lease Assumption Motion, the Debtor sought to assume the Lease as amended by a fifth amendment (the "Fifth Amendment"). The Fifth Amendment, *inter alia,* (i) reduced the amount of square footage rented by the Debtor; (ii) provided for a Lease term expiring on April 30, 2006 with a three (3) year option to extend; and (iii) reduced the Debtor's Operating Expense Percentage Share to 12.89% and reduced the Debtor's Tax Percentage Share to 9.13%.

15.     The Fifth Amendment also permitted the Debtor to defer the payment of a significant portion of rent. Specifically, the Fifth Amendment provided that the Debtor would pay the reduced monthly amount of $30,000 until the earlier of (a) the Debtor receiving at least $5,000,000 in new equity financing or (b) September 30, 2003, upon which all deferred rent would become due. On July 23, 2003, the Court entered an order approving the Lease Assumption Motion. See, D.I. 65. The Debtor did not receive any new equity financing and thus, on September 30, 2003, the Debtor owed Ledgemont approximately $91,651.00 in deferred rent (the "Deferral Payment").

16.     The Debtor failed to make the Deferral Payment when it came due. Shortly thereafter, the Debtor filed the (i) Motion of the Debtor Pursuant to Sections 363 and 365 of the Bankruptcy Code for Order Authorizing: 1) Private Sale of Assets Free and Clear of Liens, Claims and Encumbrances to Brian Seed; and 2) Assumption and Assignment of Executory Contracts, and the (ii) Motion of the Debtor Pursuant to Section 363 of the Bankruptcy Code for Order Authorizing Private Sale of Assets Free and Clear of Liens, Claims and Encumbrances to Brian Seed [D.I. 102-104] (as amended, the "Sale Motions"). Pursuant to the Sale Motions, the

Debtor sought to transfer substantially all of the Debtor's assets to Brian Seed in exchange for (a) the cancellation of Dr. Seed's debt and (b) $95,000. The $95,000 was insufficient to pay the Debtor's obligations under the recently assumed Lease or any other administrative expense. The Sale Motions sought an expedited sale process to procure a sale to Dr. Seed – the Debtor's founder, treasurer, director and 14.9% stockholder.

17.    Ledgemont and General Electrical Capital Corporation objected to the Sale Motions. As a result of these objections, the Debtor was forced to market the Debtor's assets, rather than procure a quick sale to an insider. The Debtor ultimately sold its assets in an arm's length transaction to a non-insider, Compound Therapeutics, Inc. ("CTI"), for $4,067,500.

## The Debtor's Deception Begins With Misleading Statements in The Disclosure Statement and Plan

18.    On March 25, 2004, the Debtor filed the Second Amended Disclosure Statement With Respect to Debtor's Second Amended Plan of Reorganization Dated March 25, 2004 [D.I. 283] (the "Disclosure Statement"). The Disclosure Statement was approved by the Court as containing adequate information on March 29, 2004. See, D.I. 289.

19.    In reliance on the veracity of the statements set forth in the Disclosure Statement, Ledgemont did not object to the Disclosure Statement.

20.    Specifically, among the Disclosure Statement's material statements upon which the Court and Ledgemont relied are:

      a.    "Except where specifically stated otherwise, the information contained in this Disclosure Statement has been obtained from the financial records of the Debtor in the ordinary course of its business." Disclosure Statement, Section I, p. 2.

      b.    "The only other substantial asset the Debtor needs to liquidate is its commercial lease for its premise. The Debtor intends to market its lease to obtain a sub-tenant for the premises." Disclosure Statement, Section III.B, p. 8.

c.    "[T]he only post-confirmation activities that will take place will be the marketing of its commercial lease, a claims objection proceeding and distributions to claim holders." Disclosure Statement, Section III.C.

d.    "Under the Plan, administrative expenses and claims under 11 U.S.C. § 507(a)(1) will be paid in full on the Effective Date provided, however, if an objection is filed to Ledgemont Realty Trust's ("Ledgemont") administrative claim, no priority claims will be paid until Ledgemont's claim is resolved and its allowed claim paid in full." Disclosure Statement, Section IV.A.

e.    "Other administrative claims include the claim of Ledgemont Realty Trust for post-petition lease obligations against the Debtor, the employment contract termination claims and post-petition trade payables." Disclosure Statement, Section IV.A, p 9.

f.    "Of the total amount of administrative expenses, the Debtor has estimated that $750,000 compromises the claim of Ledgemont, arising out of its lease with the Debtor dated September 17, 1998, as amended, which was assumed by the Debtor pursuant to the Bankruptcy Court's Order dated July 23, 2003 (the "Lease"). however [sic], as noted below, the total amount of Ledgemont's administrative expense claim is estimated by the Debtor to be approximately $1,500,000. Unless (i) Ledgemont agrees to accept $750,000 on account of its claim pursuant to an agreement with the Debtor, or (ii) the Debtor files an Objection to the Ledgemont's claim prior to the Effective Date, the Debtor will be required to pay the full amount of the claim on the Effective Date." Disclosure Statement, Article IV.A, p. 10.

g.    "The grounds for [the Ledgemont] objection include that the claim should be reduced by the amount that Ledgemont is likely to receive from subletting the Premises." Disclosure Statement, Article IV.A, p.10 fn. 5.

h.    "Funding for the obligations of Phylos under the Plan will be from funds on hand as of the Effective Date. The Debtor estimates that as of the Effective Date, the Debtor will have approximately $2,800,000 available to pay creditors' claims." Disclosure Statement, Article V, p. 16.

i.    "Under the Plan, the Debtor estimates that it will be required to make the following payments under the Plan: Miscellaneous Administrative Claims .... Ledgemont Realty Trust $750,000."

Disclosure Statement, Article VII.A., p. 19.

j.  "The Debtor is estimating that Ledgemont Realty Trust will hold an allowed administrative claim in the amount of $750,000 for purposes of this Disclosure Statement. As of the Confirmation Date, it is anticipated that the Debtor will still owe unpaid lease obligations in the amount of $1,500,000 under its commercial lease with Ledgemont. The Debtor believes that it will be able to reduce Ledgemont's claim by subletting its space and/or through a claims objection proceeding. Therefore, for purposes of this Disclosure Statement, the Debtor is estimating the claim of Ledgemont to be approximately $750,000. However, the Debtor can provide no assurance that it will prevail in its objection, or that the administrative expense claim of Ledgemont will be reduced by $750,000 or any other amount, until its objection to Ledgemont's claim is adjudicated by the Bankruptcy Court." Disclosure Statement, Article VII.A, p. 19 fn. 9.

k.  "Phylos asserts that its Plan is feasible because the Debtor has the funds on hand in its Debtor in Possession Account to meet is obligations under the Plan." Article IX, p. 21.

l.  "To the extent that the Debtor reduces its lease obligations, it will have more monies available to pay creditors' claims. Therefore, there is no value to this lease except to the extent it decreases Ledgemont Realty Trust's administrative claim." Article X.6, p. 22.

21. On March 25, 2004, the Debtor filed the Debtor's Second Amended Plan of Reorganization [D.I. 282] (the "Plan"). The Plan includes the following pertinent terms:

a.  "The balance of any allowed Administrative Claim that remains unpaid as of the Effective Date (including without limitation the Ledgemont Claim [hereinafter defined] unless an objection thereto is filed prior to the Effective Date) shall be paid in cash in full on the Effective Date." Plan, Article 2.1, p. 3.

b.  "The monthly financial report shall include the following: (1) a statement of all disbursements made during the course of the month, whether or not pursuant to the Plan; (2) a summary, by class, of amounts distributed or property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or transfers of property under the Plan; (3) the Debtor's projections as to its continuing ability to comply with the terms of the Plan; (4) a description of any other factors which may materially affect the Debtor's ability to consummate the Plan; and (5) an estimated date

when an application for final decree will be filed with the Court (in the case of the final monthly report, the date the decree was filed)." Plan, Article 2.1, p 4.

    c.    "The Debtor shall pay the holders of allowed Class One claims on the Effective Date in full settlement and satisfaction of the claims; provided however, that if an objection is filed to the Administrative Claim (the "Ledgemont Claim") of Ledgemont Realty Trust ("Ledgemont") arising under its lease with the Debtor dated September 17, 1998, as amended and assumed by the Debtor (the "Lease") prior to the Effective Date, no payments will be made to any holder of a claim in Class One until the Court enters a Final Order with respect to the objection to the Ledgemont Claim, and such Allowed Claim is paid in full." Plan, Section 3.1, pp. 5-6.

    d.    "Under the Plan, each holder of an allowed General Unsecured Claim, ..., shall be paid ... a _pro rata_ lump sum dividend of the balance of proceeds remaining in the estate after payment of allowed administrative and priority claims. The balance of the funds in the estate will depend upon the result of the Debtor's claims objections and the resolution of the Debtor's administrative claim owing to Ledgemont Realty Trust. No payments will be made to any holder of a General Unsecured Claim until any objection to Ledgemont's administrative expense claim is adjudicated or otherwise settled, and Ledgemont's allowed claim is paid in full." Plan, Section 3.4, pp. 8-9.

22.    On May 7, 2004, the Debtor filed the Affidavit of Gustav Christensen, Chief Executive Officer of Phylos, Inc. Regarding Best Interests and Feasibility of Debtor's Chapter 11 Plan [D.I. 310] ("Christensen Affidavit") in support of confirmation of the Plan. The Christensen Affidavit makes the following statements in support of confirmation of the Plan:

    a.    "[T]he Debtor needs to pay certain necessary operating expenses including rent and monies to decommission its leased premises." Christensen Affidavit, ¶ 2.

    b.    "The following claims need to be paid before the general unsecured creditors, would receive any dividend: (i) Administrative Claims ... Ledgemont Realty Trust $750,000.00." Christensen Affidavit, ¶8.

    c.    "The dividend paid to general unsecured creditors will depend on the Debtor's Objection to the administrative claim of Ledgemont Realty Trust. The Debtor asserts that Ledgemont Realty Trust has an

obligation to mitigate its lease claim, and the Debtor intends to object to Ledgemont Realty Trust's claim. Therefore, the Debtor estimates that Ledgemont Realty Trust's claim will total approximately $750,000.00." Christensen Affidavit, ¶ 8.

d.  "I believe the Plan is feasible under § 1129(a)(11) of the Bankruptcy Code because Confirmation of the Plan is unlikely to be followed by the liquidation or further need for reorganization of the Debtor." Christensen Affidavit, ¶ 11.

e.  "My analysis of the Debtor's debt repayment program reflected in the Plan indicates that: (i) the Debtor will have the capability of meeting its obligations under the Plan; and (b) [sic] confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization for the reasons discussed above." Christensen Affidavit, ¶ 13.

f.  "The Debtor's Plan has been proposed in good faith and is not forbidden by law." Christensen Affidavit, ¶ 15.

23.  On May 11, 2004, the Findings of Fact, Conclusions of Law and Order Under 11 U.S.C. § 1129(a) and (b) Confirming Second Amended Liquidating Plan of Reorganization of Phylos, Inc. [D.I. 313] (the "Confirmation Order") was entered. The Confirmation Order contains the following findings of fact and decrees:

a.  "The Plan complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, thereby satisfying 11 U.S.C. § 1129(a)(1)." Confirmation Order, ¶ 10.

b.  "The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. This Court has examined the totality of the circumstances surrounding the formulation of the Plan. Based upon the evidence presented at the Hearing, the pleadings, briefs, memoranda, affidavits and other submissions filed in connection therewith and the arguments of counsel and offers of proof made at such hearing, the Court finds and concludes that the Plan has been proposed with the legitimate purpose of liquidating the Debtor's assets and affairs and making distributions to the Debtor's creditors pursuant to the plan." Confirmation Order, ¶ 8.

c.  "The treatment of Administrative Expense Claims under Article 2.1 of the Plan satisfies the requirements of section 1129(a)(9)(A) of the

Bankruptcy Code." Confirmation Order, ¶ 24.

d.    "The Plan explicitly provides for the liquidation and distribution to creditors followed by the dissolution of the Debtor. Therefore, there is no risk that the Debtor will be the subject of further insolvency proceedings and section 1129(a)(11) Bankruptcy Code [sic] is satisfied." Confirmation Order, ¶ 26.

e.    "In accordance with Bankruptcy Rules 2002 and 3020(c), on or before the Effective Date, the Debtor (or its agent) shall give notice of entry of this Confirmation Order, in substantially the form attached hereto (the "Notice of Confirmation"). Confirmation Order, ¶ P.

24.    The Debtor has failed to give notice of the Effective Date of the Plan, as the Notice of Confirmation was never filed with the Court or served upon the parties required by the Confirmation Order and Bankruptcy Rule 2002.

**The Debtor's Deception is Uncovered Through Its
Multiple Objections to the Ledgemont Claim**

25.    Pursuant to the Confirmation Order, as proposed by the Debtor, the Debtor was required to file an objection to the administrative claim of Ledgemont prior to the Effective Date, even though Ledgemont was not obligated to file its administrative claim not until thirty (30) days after the Effective Date. Thus, on May 28, 2004, the Debtor filed the Debtor's Objection to Claim of Ledgemont Realty Trust (Substantive) [D.I. 323] (the "First Objection"). In the First Objection, the Debtor stated that "[a]s the Debtor liquidated its assets and will cease operations as soon as its Plan is consummated, the Debtor's Lease [with Ledgemont] will be terminated." First Objection, ¶9.

26.    The Debtor further stated that "Ledgemont's claim is an administrative claim [that] the Debtor needs to determine ... before a distribution can be made under the Plan ...." First Objection, ¶ 10. The Debtor further stated its belief that the "total amount owing to Ledgemont under the Lease is $1,200,000." First Objection, ¶ 11. Nonetheless, the Debtor

argued that Ledgemont is required to mitigate its damages by obtaining a new tenant, which would reduce Ledgemont's administrative claim. First Objection, ¶¶ 15-16. In addition, the Debtor argued that Ledgemont's claim should be reduced to provide for a discount for a present cash value payment to Ledgemont. Id.

27.     Nowhere in the First Objection did the Debtor assert that Ledgemont's claim for future rent is not entitled to administrative priority pursuant to Section 503(b) of the Bankruptcy Code. Nor did the Debtor assert in the First Objection that the payment of Ledgemont's claim was not an obligation of the Debtor.

28.     On July 1, 2004, Ledgemont filed Ledgemont Realty Trust's Motion for Allowance of Administrative Expense [D.I. 340] (the "Ledgemont Administrative Motion"). In the Ledgemont Administrative Motion, Ledgemont sought pursuant to Sections 365(g)(1) and 503(b)(1) of the Bankruptcy Code the allowance and payment of an administrative claim of $1,224,195.45 (the "Ledgemont Claim"). The Ledgemont Claim consists of (a) $1,124,343.45 for rent and additional rent through the balance of the Lease term; (b) $45,000.00 for environmental remediation and monitoring expenses; and (c) $54,852 for attorneys' fees.

29.     On August 2, 2004, the Debtor filed the Debtor's Response to Motion for Allowance of Administrative Expenses and Supplemental Objection to Claim of Ledgemont Realty Trust (Substantive) [D.I. 361] ("Second Objection"). In the Second Objection, the Debtor again argued that Ledgemont "has failed and refused to mitigate its damages." Second Objection, ¶ 7. In the Second Objection, the Debtor argued that (a) the Ledgemont Claim is overstated as it fails to take into account rent paid; (b) 10%, rather than 2.78%, should be the discount rate applied on Ledgemont's claim; (c) Ledgemont orally agreed to reduce its rental rate; (d) Ledgemont is not entitled to collect monies for environmental remediation and

monitoring expenses; and (e) Ledgemont is not entitled to attorney's fees because the Debtor's lease has not yet been terminated. Second Objection, ¶¶ 10-17.

30.     Nowhere in the Second Objection did the Debtor allege that Ledgemont is not entitled to an administrative claim under the Lease and the Fifth Amendment. Nor did the Debtor assert in the Second Objection that the payment of the Ledgemont Claim was not an obligation of the Debtor.

31.     On October 5, 2004, Ledgemont filed Ledgemont Realty Trust's Response to Debtor's Response to Motion for Allowance of Administrative Expenses and Supplemental Objection to Claim of Ledgemont Realty Trust [D.I. 380] (the "Ledgemont Response"). In the Ledgemont Response, Ledgemont countered each of the Debtor's arguments in the Second Objection, including, without limitation, the Debtor's misapplication of Massachusetts state law. Massachusetts state law provides that a landlord has no duty to mitigate damages prior to the termination of a lease.

32.     In sum, Ledgemont repeated what the Debtor admitted in the Disclosure Statement, the Plan, the First Objection and the Second Objection: Ledgemont is entitled to the full amount of the obligations under the Fifth Amendment to the Lease as an administrative claim.

33.     On October 6, 2004, the Debtor, through its counsel, advised Ledgemont that it would not pay rent due under the Lease because, it alleged, Ledgemont was using a portion of the leased premises as a construction storage area. The Debtor's refusal to pay rent to Ledgemont was accompanied by neither an allegation that Ledgemont breached the Lease nor a notice of any default under the Lease. Regardless, on October 8, 2004, Ledgemont advised the Debtor that it had, on October 7, 2004, removed from the leased premises a few ceiling tiles and

lab benches that had been temporarily placed in a thirty (30) square foot area unused by the Debtor by an independent contractor that was refitting other rental space at the building. Ledgemont further advised the Debtor that it viewed the Debtor's letter as a pretext for withholding rent in violation of the Lease and that if the Debtor failed to make its October rental payment, Ledgemont would file a motion to compel the Debtor to honor its obligations under the Lease. Because of the Debtor's continued refusal and failure to pay October rent, on October 26, 2004, Ledgemont filed its Motion to Compel Debtor to Perform its Rental Obligation Under Assumed Lease with Ledgemont Realty Trust [D.I. 387]. As of the date hereof, the Debtor has paid neither October rent nor November rent that is due under the Lease.

34. On October 26, 2004, the Debtor's deception was brought fully to light. In the Debtor's Motion for Partial Summary Judgment Concerning Ledgemont's Assertion of an Administrative Claim for Future Rents [D.I. 381] and its Memorandum of Law in Support of Debtor's Motion for Partial Summary Judgment Concerning Ledgemont's Assertion of an Administrative Claim for Future Rents [D.I. 382] (collectively, the "Summary Judgment Motion"), the Debtor declared -- in direct contradiction to representations in the Disclosure Statement, the Christensen Affidavit and Plan, and contrary to the assertions in the First Objection and Second Objection -- that Ledgemont does <u>not</u> have an administrative claim. Even though the Debtor previously admitted that the Debtor owed $1.5 million as an ***administrative*** claim in the Disclosure Statement, the Debtor accused Ledgemont of seeking "a windfall" and argued that Ledgemont is not entitled to an administrative claim for future rent owing under the Fifth Amendment. <u>See</u>, Summary Judgment Motion, p. 5; <u>see</u> <u>also</u>; Disclosure Statement, Section IV.C ("[T]he total amount of Ledgemont's ***administrative expense*** claim is estimated by the Debtor to be approximately $1,500,000.") (emphasis added); Disclosure Statement, Section

VII.A (estimating the *__allowed__* *__administrative claim__* of Ledgemont at $750,000 and recognizing that the Debtor's current obligation is approximately $1.5 million) (emphasis added); Plan, Article 3.1 (defining the *__Administrative Claim__* of Ledgemont); Christensen Affidavit estimating the *__allowed__* *__administrative claim__* of Ledgemont at $750,000) (emphasis added).

35.     The Debtor reached its absurd conclusion by ignoring its previous representations to this Court, and constructing a tortured reading of the terms of the Plan and applicable law. Moreover, the Debtor blatantly misrepresented the facts of this case and boldly asserted that "the Debtor-in-possession neither rejected nor defaulted by failing to make payments due on its lease with Ledgemont." In point of fact, the Debtor defaulted on its obligations by failing to pay the Deferral Payment when it came due and by failing to pay October 2004 rent. Since the finding of the Summary Judgment Matter, the Debtor has failed to pay November 2004 rent. Despite these defaults, the Debtor concluded that because there was no breach or rejection of the Lease, Ledgemont cannot assert a claim against the "Debtor-in-possession" and any default under the Lease would be by the "Reorganized Debtor, which is a separate legal entity from the Debtor-in-possession." Under the Plan, however, there is no "Reorganized Debtor"; the Debtor's argument is based entirely on a premise it knows to be untrue.

### The Debtor's Failure to Comply with the Terms of the Plan and Post-Confirmation Breaches of Fiduciary Duties

36.     On October 26, 2004, the Debtor filed four monthly operating reports relating to the post-confirmation estate of the Debtor for the period June through September 2004 [D.I. 383-386] (collectively, the "Post-Confirmation Reports"). At the time the Post-Confirmation Reports were filed, and for the time periods covered by the Post-Confirmation Reports, the Debtor had liquidated substantially all of its assets and was not operating. The Post-Confirmation Reports reflect that the following payments had been made: (i) Lab Supplies and Operating Expenses -

$211,715.94; (ii) Secured/Rental/Leases - $100,647.16; (iii) Loan Advances - $819,041.10; and (iv) Professional Fees - $302,264.86. The September Post-Confirmation Report reflects that the Debtor currently has $1,143,155.35 in cash, a reduction of approximately $1.7 million from the time the Plan was confirmed.

37.     The Post-Confirmation Report does not detail whether these expenses were incurred pre or post-confirmation.     The payment of $211,715.94 in post-confirmation "operating" expenses for a liquidating Debtor with no operations appears to be improper.     In addition, the Post-Confirmation Report does not provide the detail required by the Plan. Specifically, the Debtor failed to state (a) whether any distributions were made pursuant to the Plan; (b) a summary by class of the amount distributed under the Plan or an explanation for the failure to make a distribution; (c) the Debtor's projections as to its continuing ability to comply with the terms of the Plan; (d) a list of factors which may materially affect the Debtor's ability to consummate the Plan; or (e) an estimated date when the Debtor will file a motion for final decree. See Plan, Section 2.1, p. 2.     Thus, the Debtor has failed to comply with its own self-imposed monthly reporting requirements.

38.     The Debtor's most egregious post-confirmation conduct relates to its failure to object to a patently questionable claim of Gustav Christensen, the Debtor's sole remaining officer.     On June 23, 2004, Mr. Christensen, filed his Request for Payment of Administrative Claim [D.I. 334] (the "Christensen Administrative Claim").     Pursuant to the Plan, Mr. Christensen's employment contract was rejected on the Effective Date.     In the Christensen Administrative Claim, Mr. Christensen alleges that this rejection entitles him to an administrative claim "to the extent the benefits were earned for services rendered post-petition."     Mr. Christensen contends that since he was an employee of the Debtor post-petition, he should

receive a pro-rata portion of his rejection damages claim as an administrative expense. Christensen Administrative Claim, ¶ 5. In addition, Mr. Christensen requested severance pay of $525,000 (or $26,166.67 times 18 months) (the "Christensen Claim"). Id. Mr. Christensen's annual salary was $350,000.00.

39.     Mr. Christensen's employment agreement was entered into on September 1, 2000 and thus is a prepetition contract which was rejected by the Debtor. Under the Bankruptcy Code and applicable case law (a) Mr. Christensen is not entitled to an administrative claim for a rejection of a prepetition contract, see 11 U.S.C. § 365(g)(1); and (b) to the extent it is valid, the Christensen Claim is capped at $350,000. See 11 U.S.C. § 502(b)(7). Moreover, the terms of the Plan expressly provide, consistent with the Bankruptcy Code, that any claim for damages arising out of a rejection of an executory contract shall be a Class 4 – General Unsecured Claim. See, Plan, Article 4.1. Nonetheless, the Debtor failed to object to either the amount or priority status of the Christensen Claim and the deadline to do so may have expired. See, Confirmation Order, ¶ J (setting forth the deadline to object to administrative claims as ninety-days after the Effective Date).

**COUNT I**
**REVOCATION OF THE CONFIRMATION ORDER**
**(11 U.S.C. § 1144)**

40.     The Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

41.     Section 1144 of the Bankruptcy Code provides

> On a request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and hearing, the court may revoke such order, if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall
>
> (1) contain such provisions as are necessary to protect any entity acquiring

rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

11 U.S.C. § 1144.

42. Through the Plan, Disclosure Statement and Christensen Affidavit, the Debtor proposed a liquidating plan which would pay secured and priority creditors in full and distribute the remaining assets of the Debtor's estate pro rata to general unsecured creditors.

43. In connection therewith, and as required by the Bankruptcy Code, the Debtor set forth in the Disclosure Statement and the Christensen Affidavit the Debtor's assets on hand - $2,800,000 in cash – and the Debtor's expected liabilities.

44. The Disclosure Statement, Plan and Christensen Affidavit expressly state that the Debtor's books and records reflect that the Debtor owes Ledgemont, as an administrative expense of the Debtor's estate, approximately $1.5 million, which the Debtor believed could be reduced to $750,000. The Disclosure Statement, the Plan and the Christensen Affidavit all expressly state that this claim would be paid, in full, from estate funds prior to the payment of priority and general unsecured claims.

45. The Court and parties-in-interest (including Ledgemont) relied on these representations to determine (a) whether the Disclosure Statement provided adequate information pursuant to Section 1124(a) and (b) whether the Debtor complied with Section 1129(a), including without limitation, that the Debtor proposed the plan in good faith and that the Plan was feasible.

46. The Debtor's statement that it would be required to pay an estimated administrative claim of at least $750,000 to Ledgemont -- a statement which the Debtor's post-confirmation actions reveal was made to mislead the Court, Ledgemont and the Debtor's other

creatures -- had a material effect on the Court's and Ledgemont's analysis and determination of whether the Plan met the requirements of Section 1129(a). The Debtor represented that it intended to pay the _full_ amount of Ledgemont's claim, including future rent, from the sole remaining asset of its liquidating estate (i.e., the funds generated by the CTI sale). The Debtor, however, now asserts that there is a "Reorganized Debtor" that is responsible for performing the Lease obligations, although this "Reorganized Debtor" has no funds to cover the liability. The Plan itself makes no reference to a "Reorganized Debtor" and, as is plain from the Post-Confirmation Reports, the Debtor does not have sufficient funds to pay the Ledgemont Claim.

47. Whether in the form of an administrative expense claim or a continuing obligation of the Debtor, in order for the Plan to have met the feasibility requirement, the Debtor must comply with its assumed Lease obligations. If not, the Plan either lacked sufficient funds or would be followed by a further liquidation. Thus, in connection with the Disclosure Statement and Plan, the Debtor deceived the Court by stating it would pay the administrative claim of Ledgemont and later attempting to saddle a nonexistent, insolvent "Reorganized Debtor" with that obligation.

48. The Debtor also misled and defrauded the Court by failing to state its intention to argue post-confirmation that it would seek to release the claims of the Debtor as a "debtor-in-possession," through the Plan. In the Summary Judgment Motion, the Debtor has drawn a legal distinction between the obligations of the "debtor-in-possession" and the obligations of a post-confirmation "Reorganized Debtor." The Plan itself makes no legal distinction between the Debtor as a debtor-in-possession and the post-confirmation Debtor. In fact, the only definition in the Plan of "Debtor" is Phylos, Inc. All of the obligations under the Plan are of the "Debtor" as defined in the Plan. Nonetheless, in the Summary Judgment Motion, the Debtor argues that

"Reorganized Debtor" is responsible for the Ledgemont Claim.

49.     Nowhere in the Disclosure Statement or Plan process did the Debtor inform the Court, Ledgemont or its creditors of its intent to take positions post-confirmation in direct violation of the terms of the Disclosure Statement and Plan.   In addition, nowhere in the Disclosure Statement or Plan does the Debtor reveal its intent that, although the Disclosure Statement, Plan and Christensen Affidavit state that administrative claims would be paid in full by the Debtor, including the allowed administrative claim of Ledgemont of at least $750,000, the Debtor would object post-confirmation to the payment of these claims on the ground that they are liabilities of a "Reorganized Debtor."   In fact, the Plan itself purports to pay the claims of the pre-petition Debtor and the "debtor-in-possession."   See e.g.   Plan, Article II – Treatment of Unclassified Claims Described by Section 507(a)(1), Section 507(a)(2) or Section 507(a)(8).

50.     In sum, the Debtor's position on the Summary Judgment Motion and its post-confirmation depletion of its estate reveals its fraud and bad faith in pursuing confirmation of the Plan.   The Debtor repeatedly assured the Court and its creditors of its intention to pay its obligations, including Ledgemont's future rent claim, from estate funds.   Now, the Debtor has depleted those funds and has made plain its intention to never pay that claim by shifting responsibility for it to a "Reorganized Debtor" never mentioned in the Disclosure Statement or the Plan.   This "Reorganized Debtor" does not exist and, if it did exist, is entirely without funds to satisfy claims.   The Debtor's conduct is precisely the type of fraudulent behavior that section 1144 of the Bankruptcy Code is intended to address.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against the Debtor as follows:

A.     Vacating the Confirmation Order pursuant to 11 U.S.C. § 1144;

B.    Awarding to the Plaintiff attorneys fees' and costs incurred in connection with prosecuting this action; and

C.    Awarding such other and further relief as this Court deems necessary and just.

## COUNT II
## APPOINTMENT OF A CHAPTER 11 TRUSTEE
## (11 U.S.C. § 1104)

51.    The Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

52.    Section 1104 of the Bankruptcy provides

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

53.    The Plaintiff requests that the Court appoint a Chapter 11 Trustee based on the Debtor's fraud as detailed in Count I.

54.    The Debtor's fraud and mismanagement is not limited to those outlined above. Since confirmation in May, the Debtor's only distribution under the Plan appears to be to the Debtor's founder, treasurer and shareholder, Dr. Seed, and to the Debtor's professionals. The Debtor's failure to make distributions to creditors is directly tied to its failure to resolve or pay the Ledgemont Claim.

55.     The Debtor's Summary Judgment Motion contains allegations and takes positions that expressly violate the terms of the Disclosure Statement and Plan.  Doing so is grounds for appointment of a Chapter 11 Trustee.

56.     Moreover, as set forth in the September Post-Confirmation Report, the Debtor has cash only of $1,143,155.56.  This amount is insufficient to satisfy its admitted liability to Ledgemont of between $1.2 – 1.5 million.  Because the Debtor has objected to the Ledgemont Claim, no other priority claims can be paid pursuant to the Plan.  The Debtor, thus, does not have the ability to pay its priority obligations.

57.     In addition, the Debtor failed to object to the Christensen Claim, which is patently invalid under the Bankruptcy Code. The Debtor's failure to object has resulted in the obligation to pay an insider an invalid administrative claim.

58.     Finally, the Debtor has failed to comply with its self-imposed reporting obligations set forth in the Plan.  The Post-Confirmation Reports do not detail (a) whether any distributions were made pursuant to the Plan; (b) a summary by class of the amount distributed under the Plan or an explanation for the failure to make a distribution; (c) the Debtor's projections as to its continuing ability to comply with the terms of the Plan (which should have addressed what the Debtor intended to do about the "Reorganized Debtor's" lack of funds to pay continuing Lease obligations); (d) a list of factors which may materially affect the Debtor's ability to consummate the Plan; or (e) an estimated date when the Debtor will file a motion for final decree. See Plan, Section 2.1, p. 2.

WHEREFORE, the Plaintiff respectfully requests that the Court enter an order:

A.      Appointing a Chapter 11 Trustee;

B.      Awarding to the Plaintiff attorneys fees' and costs incurred in connection with

prosecuting this action; and

  C.  Granting such other further relief as this Court deems just and proper.

**COUNT III**
**BREACH OF FIDUCIARY DUTY BY DEBTOR AND GUSTAV CHRISTENSEN**

  59.  The Plaintiff incorporates each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

  60.  The Debtor owes its creditors, including Ledgemont, a fiduciary duty to preserve the assets and value of the estate and distribute this value to its creditors.

  61.  Gustav Christensen, as the Debtor's sole director, has a fiduciary duty to the Debtor, including a duty of good faith, due care and loyalty.

  62.  The Debtor is insolvent and, thus, the Debtor's and Mr. Christensen's fiduciary duties extend to all of the Debtor's creditors, including Ledgemont.

  63.  The Debtor and Mr. Christensen breached and violated this fiduciary duty by failing to object to the Christensen Claim. Further, Mr. Christensen's filing of and failure to object to his own claim was designed to benefit and enrich himself at the expense of the Debtor's creditors.

  64.  The Debtor and Mr. Christensen further breached this fiduciary duty by defrauding the Court as set forth in detail in Counts I and II, which are incorporated herein by reference.

  65.  The Debtor and Mr. Christensen further breached this fiduciary duty by embarking on frivolous litigation regarding the admitted administrative expense claim of Ledgemont.

  66.  The Debtor and Mr. Christensen further breached this fiduciary duty by paying claims and leaving the Debtor with insufficient funds to pay the admitted administrative claim of

Ledgemont, the Debtor's Class One Priority claimants or make any distributions to unsecured creditors in violation of the express terms of the Plan and Disclosure Statement.

67.     As a direct and proximate result of the Debtor and Mr. Christensen's breach of fiduciary duties, the Debtor's estate has incurred at least $147,471.91 as an invalid administrative expenses and at least $27,528.09 as an invalid general unsecured claim thereby diminishing the distribution to the Debtor's unsecured creditors.

68.     As a direct and proximate result of the Debtor and Mr. Christensen's breach of fiduciary duties, the Debtor has incurred substantial legal and so called "operating expenses" during the Debtor's protracted and unwarranted litigation over the Ledgemont Claim.

69.     As a direct and proximate result of the Debtor and Mr. Christensen's breach of fiduciary duties, the Debtor has incurred substantial costs relating to the Disclosure Statement and Plan and the procurement of the Confirmation Order, all which were perpetrated through the Debtor's fraud and bad faith.

70.     It would be futile for Ledgemont to request that the Debtor prosecute claims against itself and Mr. Christensen, its sole director. Conferring derivative standing to Ledgemont to prosecute these claims on behalf of the Debtor's estate and its creditors will benefit the Debtor's estate and its creditors.

WHEREFORE, the Plaintiff respectfully requests that the Court enter a judgment:

A. Authorizing Ledgemont to pursue derivative claims of breach of fiduciary duty against the Debtor and Mr. Christensen, on behalf of the Debtor's estate;

B. Assessing damages against the Debtor and Mr. Christensen's as a result of their breaches of their fiduciary duties;

C. Awarding to the Plaintiff attorneys fees' and costs incurred in connection with prosecuting this action; and

D. Granting such other further relief as this Court deems just and proper.


Dated: November 8, 2004          **LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

and

Michael J. Goldberg (BBO #551869)
Justin S. Belair (BBO #654174)
SHERIN AND LODGEN LLP
101 Federal Street
Boston, Massachusetts 02110
Telephone: (617) 646-2000
Facsimile: (617) 646-2222

Counsel for Ledgemont Realty Trust